Good afternoon, everyone. We're here to hear a single case, Francis v. Kings Park Manor, and the En Bonne Court has been convened for this purpose. I'm told that all the judges are on the line, with the exception of Judge Hall, who was unable to be with us today, but who will be listening to the argument and deliberating and participating as part of the panel. We're proceeding telephonically today, and as we apprised the council earlier, we're gonna begin with the argument of Donahue-Francis presented by Mr. Sandberg-Champion. He'll argue for two minutes, and then Mr. Adagbile will argue for two minutes as court-appointed counsel, and then we'll have a round of questioning from the court, proceeding from the most senior judge to the most junior, and those will be in three-minute rounds. The United States will then argue, and the United States is represented today by Mr. McGeary, and again, two minutes of uninterrupted argument, followed by a round of questions, and then Mr. Brennan will argue on behalf of Kings Park Manor. So I've named four lawyers, and I assume they are also all on the line. Could you just confirm that for me? Thank you. This is Mr. Sandberg-Champion. I am here. Mr. Adagbile is present, Your Honor. Good afternoon, Your Honors. Alexander Malgeri for the United States. Good afternoon, Your Honors. Frank Brennan for the appellate. Thank you very much. So we're all present and accounted for, and I believe we are ready to begin. We'll hear first from Mr. Sandberg-Champion. Thank you, Chief Judge Livingston, and may it please the Court, Sasha Sandberg-Champion for Plaintiff Appellant, Donna Hugh-Francis. Your Honors, we allege that a landlord was repeatedly informed of severe racial harassment of one tenant by another, including physical threats and the violent racial epithets, and we allege that it made the considered decision not to act at all, contrary to how it usually handles obvious lease violations. We contend today that such allegations suffice to plead intentional discrimination under the Fair Housing Act, under either a deliberate indifference or a differential treatment theory. As the Supreme Court said in Davis v. Monroe County Board of Education, a school district can commit its own intentional discrimination by choosing to allow discriminatory harassment to continue. The same rules should apply under the Fair Housing Act as it does under other major civil rights laws, such as Title VII, Title IX, and Section 1981. Defendants have asserted that landlords cannot control tenant's harassment conduct to the same degree that employers control employees or schools control students, but that's not the question. What matters is that landlords do have tools to address major lease violations, up to and including eviction if necessary. There's no basis for categorically excluding all landlords from liability under any circumstance, no matter how much knowledge they do have and no matter what tools they do have to address tenant misconduct. Certainly, it's plausible that a large landlord with a professional property manager can do something about tenant misconduct, such that it was both unreasonable and discriminatory not to take the most basic steps. In closing, we do not ask you to impose any new duties on landlords. We only ask you to find that it can't be intentional discrimination barred by the Fair Housing Act for a landlord to knowingly breach existing duties and deviate from its normal practices when confronted with complaints of severe racial harass. Thank you. Thank you, Mr. Sandberg-Champion. Mr. Odagbele. Good afternoon, your honors. Debo Odagbele, Wilmer Hale, court-appointed amicus. The allegations here are that Mr. Francis was subjected to a campaign of racial terror over eight months. He endured an escalating series of threats from his next-door neighbor, including racial epithets and even a death threat. Mr. Francis lived in fear, looking over his shoulder in common areas. His neighbor's acts were severe and pervasive, and Mr. Francis reasonably sought an expected redress, reporting the situation to Kings Park multiple times in writing. The police also notified Kings Park, having been made aware of this disturbing information, Kings Park made the affirmative choice to do nothing at all, even though it had an obligation to its tenants not to permit known harassment and had available options. Mr. Francis's allegations go further. Kings Park acted with intention and affirmatively instructed its agents not to address the severe racial harassment. These allegations are sufficient to create a plausible inference that defendants intentionally discriminated against Mr. Francis in violation of the FHA. Two well-recognized frameworks for showing intentional discrimination are instructive regarding the sensitive inquiry into the facts and circumstances. Both could aid in the assessment of whether the defendant is liable under the Fair Housing Act. First, under the Selective Enforcement Framework, the allegation that KPM responded to tenant complaints on issues other than racial harassment, but affirmatively refused to respond to Mr. Francis's complaint, plausibly supports an inference that defendant's actions were motivated by racial animus. Second, under the Deliberate Difference Framework, the allegation that Kings Park was aware of severe racial harassment, had a sufficient degree of control over Mr. Enders, and affirmatively chose to do nothing is probative of KPM's racial animus. The allegations create a plausible inference that KPM's choice to not intervene to protect Mr. Francis was motivated by race in violation of the FHA. A contrary rule categorically insulating landlords, regardless of how they act in response to known severe discrimination, is inconsistent with the FHA. Thank you. Mr. Sandberg-Champion, let me ask you a question about your argument. You draw an analogy, you mentioned it today, and also in your brief, to cases like Davis and Zeno, which involved school boards being held liable for student-on-student harassment. And the theory in these cases is not selective enforcement, but deliberate indifference. But Davis was pretty clear that the deliberate indifference standard narrowly confines the set of parties whose known acts of harassment can trigger some duty to respond to situations where a defendant has substantial control, not only over the environment, but also over the harasser himself. And in Davis, the language is pretty stark. We talk about comprehensive authority consistent with fundamental constitutional safeguards that the state, the custodial authority that the state has over school children. Davis even goes even further, this degree of supervision and control could not be exercised over free adults. That doesn't seem to me the way we usually think about the relationship between a landlord and tenant. So help me understand how that analogy works, how a landlord could have that degree of control over tenant so that it's fair to hold the landlord liable for the conduct of co-tenant. Well, thank you, Judge Livingston. When thinking about what Davis meant by the substantial control standard, it's instructive to remember that it made clear that this was a standard that applied not just to elementary schools of the sort that really have very minute-to-minute control over their students, but it also applied to all kinds of other schools up to and including universities, which obviously have far less minute-to-minute control over their students. And what it said was that the same deliberate and different standard, the same substantial control standard could apply to both. It's just it applies differently given the lesser degree of control that a university would necessarily have. Well, Davis was addressing school children though, correct? I mean, it wasn't about the university contact. So the Supreme Court in Davis doesn't really discuss that. Well, it does say that the same standard will apply in universities. And of course, lower courts since then have certainly held, have certainly applied it. So I don't believe that was mere dicta in Davis that it made clear that this also applies to universities. So I, you know, the same is true here. Some landlords are, and obviously some landlords are gonna have substantially more control than others over their tenants. Some situations they won't be able to deal with and some they will. But this is all fact-specific questions that can be dealt with on a factual basis rather than categorically as a matter of law excluding landlords. Thank you. Judge Cabranes? Yes, thank you, Chief Judge. Let me ask counsel for Francis. Some non-doctrinal questions, but questions directed to trying to understand what it is that you want. The decree you want would apply to the management of public housing projects, is that right? Certainly the rule would ultimately would apply to public housing projects like any other landlord. Yes, it might apply differently there. No, how differently? To the extent that you think the facts on the ground will be different to the extent that- Oh, yeah, well, that's true of every arguable defendant. I just wanted to make sure that the rule that you seek to have us adopt would apply also to the management of large and small public housing projects. Let me ask you also on this question of Title VII and the FHA, they do have very similar language prohibiting discrimination, but to retrace some of the questions that Judge Livingston asked you, are we to ignore the major significant differences between the employer-employee relationship and the landlord and tenant relationship? Not at all. I think those differences can be acknowledged in a couple of ways. First is that you don't have to apply the same sort of negligence standard that currently applies in Title VII. You can follow cases like Wetzel and decide that instead what's required here is either a differential treatment standard or a deliberate indifference standard. The second way you can acknowledge that is you can acknowledge that as a matter of fact, there may well be circumstances in which a landlord just doesn't have the substantial control required. Let me ask you about the historical context of interpretation and enforcement of this statute. This case that you're now arguing is a path-breaking case, is it not? Well, I'm not sure I would agree that it's completely path-breaking case. There have been cases going back 20 or more years, not at the appellate level, at the district court level, in which landlords and other housing providers have been held responsible for failing to provide tenants with equal benefit of lease terms, which includes protections, as we have here, Bradley v. Kerriedale, some others. The New Decker case in the Eighth Circuit has shades of that. I mean, there's a reason why HUD itself believed it was not breaking new ground when it promulgated the rule that's been discussed in this case. Thank you, Mr. Samberg-Champion. Judge Pooler? Thank you, Chief. I have a question first for Mr. Samberg-Champion. You alleged in paragraph 63 of your complaint referring to the New York State Division of Human Rights file, investigator file, that KPM intervened against other tenants regarding non-race-related violations of their leases. Who were these other tenants? What did they do? So, unfortunately, Judge Pooler, we do not have the basis for the New York agency's finding there. We are as much in the dark as you are there. We certainly would like to find out in discovery how they ordinarily treat tenant misconduct, and we assume there will be consonant with the findings that the New York State agency made. It would be good to see the file. For the amicus, counsel, you argue, and you just did, that you complete intentional discrimination under 3604B by proving or showing deliberate indifference to complaints of race-based harassment, correct? Yes, Your Honor. And you have four prongs, as you allege in your brief, to prove it. One is that KPM defendants exercised substantial control. Two is that Francis suffered severe and discriminatory harassment. Three is that defendants had actual knowledge of this harassment. And four, deliberate indifference to this actual knowledge. I think we would not take issue with two, three, and four, but as Judge Livingston's question showed, number one, substantial control over the harasser is, I think, the toughest prong for you to prove. Could you elaborate on your claim? Absolutely, Your Honor. So there are a combination of federal policy and the goals of the FHA, and also lease terms, terms that derive from the lease, including a paragraph in the lease that requires that KPM not have tenants interfere with the enjoyment of the lease of other tenants. There's also, of course, an eviction provision. But the point here is not that KPM has to exercise its maximal control and seek to evict in every case. The facts here are unusual in that KPM, in the face of being put on notice of very serious harassment, racially motivated harassment, that involved the police and even death threats, did nothing at all and went further and said to do nothing. And so we think that the facts here would allow KPM to begin to exercise its options under the lease from at least responding to the letter and then inquiring from there. Thank you, Mr. Zagdalai. Judge Katzmann? Yes, thank you, Chief Judge Livingston. I have a question for the amicus, following up on the previous line of questioning. So are you, do you acknowledge that in general, landlords have logistical, practical and legal barriers to exerting control over their tenants, unlike in the cases of schools and employers exercise of control over students and employees, but that in this particular case, those barriers have been overcome? Is that your argument? We recognize that landlords have greater barriers than in those other contexts, though it may be fair to say that there are some barriers in the other contexts. What the submission is here is that the landlord did have substantial power on these facts to begin to exercise its rights under the lease and to hold tenants, all its tenants, to the benefit of the bargain, such that it didn't have to allow wanton racial discrimination to go unchecked. Thank you. Let me ask a question of Francis's counsel. Could you address the concern about whether you have adequately raised the theory of selective enforcement that the panel relied on? So Judge Katzman, we have throughout this case always alleged that the defendants acted with some form of intentional discrimination. We've more vociferously argued for deliberate indifference throughout, but our allegation, certainly in paragraph 63 of the complaint, I think does clearly allege a selective enforcement theory. And I think that's consistent with what we did in attaching the lease, which makes clear the power that the landlord had in these circumstances and the promises it makes to the tenants, which I think raises the plausible inference that it selectively chose not to enforce these lease terms and not give the benefits of the lease to Mr. Francis. Thank you. Thank you. Judge Chin. Thank you. I have a question for Mr. Degbelay. The defendants make a floodgates argument that landlords and public housing authorities will be swamped by flood of cases if we recognize a hostile living environment claim. How do you respond to that? And do you think this is a fair concern? Thanks, Judge Chin. To be sure, not every type of complaint or dispute between tenants is something that we can expect a landlord to mediate. But in light of the federal policy and the protected categories classes under the FHA, where we have the prerequisites, for example, that we have discussed and that Judge Pooler mentioned under the deliberate indifference standard, and the court has observed that the conduct has to be clearly unreasonable in that context. And of course, there needs to be notice and it needs to be severe and discriminatory. I think that the floodgates arguments are a bit overstated. While there will be circumstances where this happens, the policy of the FHA is that if people are being harassed on account of their protected status in housing, those are situations in which we want landlords to effectuate their rights and to protect people from discrimination that's motivated by an improper purpose. And so there are limits that are cognizable. Thank you. And for Mr. Sandberg-Champion, with respect to the question or the allegation that the landlord did intervene in other non-race circumstances, are there any specifics in the complaint? What is there in the complaint in terms of allegations in this respect? So we don't have specifics as to what it did with other tenants, simply because we don't know. We have that bare information from the New York State investigative file. But what we do know is that the lease itself sets forth a policy, which the landlord pretty clearly deviated from here in terms of both the duties that will hold tenants to and the security that it will provide to its tenants. And we think there's quite a bit of case law to say that pleading such a deviation from a normal policy is sufficient without a comparator of the sort that you're describing. Well, I mean, how do you make a plausible argument that this is differential treatment if without some further allegations? Well, I think down the line, certainly in terms of the evidence that we would need at summary judgment or trial, we will have to show that. But for now, the question is just have we rate, have we satisfied what this court has called the minimal burden of showing discrimination? And we think we have based on these allegations. Thank you. Judge Lillian. Thank you, Chief. I have a question for first, Mr. Debele. KPM makes this argument that I'm sure you're aware of in response to reliance on Davis and Dino and other similar cases that it couldn't have been deliberately different because it was reasonable to let the police department deal with the harassing tenant here. So the conduct can't plausibly be described as clearly unreasonable in light of the known circumstances. Would you just briefly address that argument, Mr. Debele? Judge Loyer, KPM has independent duties under the lease agreement, some of which I've mentioned. There are several, the implied warranty of habitability. We've talked about the interference with enjoyment and the landlord is in a contract with a party, with its tenant to stand down and do nothing, not even to respond to the tenant who literally is living in fear in common spaces. And the allegation and the complaint is that Mr. Francis is looking over his shoulder. I don't think it's reasonable not only to do nothing, but to instruct your agents to do nothing on those facts. As we have submitted, there is a range of responses that may be reasonable and that may negate an inference of intentional support for this type of conduct, but to do nothing on these facts to repeated letters and the police themselves called, it just seems to me that that is not reasonable on the facts. And you also, in your opening, mentioned racial animus, but does the FHA require any allegation of racial animus as opposed to just racial discrimination, at least at the pleading stage? The FHA is trying to prohibit racial discrimination. Obviously, in this case, we have a situation where the underlying conduct, Mr. Ender's conduct, I think anybody objectively would acknowledge is characterized as animus, but the discrimination comes in for the failures to act and the instructions not to act. So what the landlord has done here is not just discriminate by virtue of its omissions, but also of its acts. Mr. Sandberg-Champion, I've got a question for you, if you would. So in the context of other anti-discrimination statutes, ADA, Title VII, and so on, we've pretty definitively said that the plaintiff doesn't even have to allege a prima facie case or animus or comparator, and it's an extremely minimal showing that we require for the plaintiff to prevail at the motions in this stage. What, in your view, are the minimal allegations necessary for an FHA claim besides alleging, as I understand it from your brief, that the challenge action was because of race, which is the 3604 language? So thank you, Judge Beaulieu. We think the standard is essentially the same under the Fair Housing Act. The question is, have we satisfied our minimal burden of pleading allegations that make it plausible that this action was because of race? And obviously, some cases involved in other statutes are gonna be more on point to the housing environment than others, but we think the ultimate standard is very similar, and it should be relatively easy to satisfy under this course of action. And how would discovery help have you prove up those allegations? Well, discovery would do a number of things. One thing that it would do is you could get information about how this landlord has treated other comparable or semi-comparable complaints in the past. We certainly would like to know more about what the defendant told its property manager in terms of instructing- Mr. Sandberg-Champion, I'm afraid I'm gonna have to ask you to wrap it up. Okay. Because the three minutes have expired. But just finish the thought, please. Okay. And then the last thing that we certainly would like to know is we'd like to find out from the defendant itself precisely why it didn't act. We have a lot of stuff in the defendant's briefing about how it was relying on the police, for example. That's not actually in our complaint. We would like to find out whether that is in fact true. Thank you very much. Judge Carney? Yes, I have a question for the amicus. I wanna just circle back to the city as landlord and concerns that have been expressed about a municipality running a large-scale housing project and trying to manage complaints that may have a racial overtone with limited resources. And what kind of rule of reasonableness allowing a complaint that is impressionistic in some respects with regard to how other complaints are handled, allowing that to go forward would work in a not unduly burdensome way against the city as a defendant landlord. Can you comment generally on what might be reasonable in that context and what would you foresee for the city as a defendant? Absolutely. This is an important point. And housing authorities have channels, existing channels to receive complaints and to respond to them. To be sure, because of the structural ways in which they're cash-strapped and under-invested in, there are serious resource questions. But the irony is that they are surviving largely on federal funds and on federal monies. So the notion that we would free these public housing entities from having to police the bounds and enforce Fair Housing Act principles is contrary to everything in the regulations and the rules that govern every contract that NYCHA, for example, and all of the fair housing authorities have to follow. I mentioned earlier what some of the limitations are, that this is not a rule that would require any landlord to police every dispute between tenants. There is a degree of pervasiveness and severity and all of the other prerequisites that I mentioned. And so I think that it is a manageable rule based on existing channels. But what a public housing authority couldn't do is what Kings Park did, which is to ignore certified letters and then, in fact, instruct its agents to do nothing in the face of death threats. Thank you. That's all I have. Judge Sullivan? Yes, thank you, Chief. This is from Mr. Degbile. If I heard you correctly, I think you indicated that, in your view, selective enforcement of the lease restrictions would support an inference of discrimination. And there've been some questions about what exactly the selective enforcement looked like, and there's really nothing in the complaint about that. But when I think about selective enforcement, I think of it sort of in terms of, well, perhaps black tenants are being held to a higher standard so that they're not taking their trash out and they're getting evicted, but white tenants are not. Here, the argument seems to be that if the landlord is enforcing certain restrictions related to, for example, disabling a fire smoke detector, that the fact that they're not enforcing the harassment that went on here would support an inference of discrimination. And it seems to me that that's, it's not clear to me how that jives. Could you address that? Yes, Your Honor. So here, I think we have to take the complaint in context and examine all the facts and circumstances that are being alleged. You're quite right that the typical case is as you've described, but I think that the Fair Housing Act would have within its ambit trying to reach discrimination where a tenant who takes a lease and pays for their lease is enduring a campaign of racial terror if landlords were deciding to allow that. If you had essentially a situation where landlords were allowing these reigns of terror to go on and were addressing the other things, this is a type of selective enforcement that would be inconsistent, I think, with both the language and the purpose of the FHA. So you're quite right that it's not exactly the type of comparator that we might see in other contexts, but it's a comparator that is fairly within the ambit of the allegations here. So a quick follow-up. Yeah. Is there anything in the complaints or in the attachments to the complaint to indicate that Mr. Francis ever asked the landlord to do anything in particular with respect to Mr. Congratulations? Here, I would suggest that we have to read the allegations and the pleadings in the full context. And so the provisions of the lease were attached. The gentleman is sending multiple certified letters to a landlord. I think it's reasonable and plausible to infer that the reason those letters are being sent is because he's living in fear. We know that the allegation is he's living in fear, that this was a criminal situation. And so it's pretty clear, I think, the natural inference, and it would be, I think, on the fact, strange to draw any other inference, that then that he was looking for some relief, at least a response from the landlord about what the possibilities may be. And we think the landlord had a range of possible responses, even some short of eviction. All right. And then very quickly, this is a question from Mr. Sandberg-Champion. This goes to the alternative relief you're seeking that we certify to the New York State Court of Appeals with respect to the state law claim. And I just wanted to ask you very quickly, is there a textual basis to distinguish between the state law and the Fair Housing Act? The textual basis is the extra provision in the New York statute, which provides that it's to be given the most expansive reading, regardless of how the federal law is read. So New York statutory law, by its term, says it can't be constrained by a particularly narrow reading of the federal Fair Housing Act. Thank you. Judge Bianco? Thank you, Chief Judge Livingston. I wanna follow up on some of Judge Sullivan's questions and Judge Poole and Judge Chinn as well. I'll pass this to Mr. Sandberg-Champion first, and if amicus can follow up if I have any additional time. Assuming we were to read the FHA as having a cause of action for a landlord's failure to respond to tenant-on-tenant racial harassment, the question is whether this pleading would cross that threshold. I heard you both just say, and this is in your papers, you obviously have to allege racial discrimination, but it can be selective enforcement or failure to act, I guess, would be the other grounds, indifference. Selective enforcement, paragraph 63, could not possibly cross that standard where it doesn't have what lease provision, whether even related to this lease provision. That can't be enough for an inference of racial discrimination. And then the failure to act, I read the papers, and correct me if I'm wrong, Mr. Sandberg-Champion, that the simple receiving a complaint from a tenant on being severely harassed by another tenant, that you believe that's sufficient alone to show an inference of racial discrimination that would allow the case, I think as you described today, to go into discovery. So my question is if a tenant just simply puts in a complaint saying, I complained to my landlord that I'd been severely harassed based upon my race by another tenant, and that landlord fails to act under your reading of the statute and the pleading standards, that case goes through discovery and has to be resolved on summary judgment. So I think that's actually a pretty straightforward result based on this court's other pleading cases. We've pled enough that provides some indicia that the decision that the landlord made here was because of race. We've set out the lease that provides its normal policies about what it expects from its tenants and what it promises from its tenants to its tenants. We have here letters in which, not just the letters, by the way, but also the police informing the landlord of what was going on. And in the face of that, we have the landlord being contacted by its property manager and asked, what should we do about it? And the landlord is affirmatively saying, stay out of it. We think under those circumstances, there's enough here just for the purposes of pleading. I'm not saying it's enough for summary judgment, but enough for pleading to raise a fair inference that there could be discrimination here. I don't think that's a terribly extraordinary result given this court's decisions in cases like Little John, in cases like Adobe Columbia, in cases like Medicare. I think that's enough to meet the minimal burden of pleading a discrimination complaint. Thank you. Is there anything Amicus Counselor wants to add on that? I would just say that, again, I point to the context where in this situation, the landlord has tools and the underlying racial discrimination that is being reported by multiple sources and multiple times is of a character and nature that a reasonable response would be expected. And so to do nothing in these facts, at least raises a question that there may be a plausible race motive. So if a tenant simply alleges in a complaint, I complained to my landlord about an incident that was harassment that I believe is based upon race, that gets you beyond the motion to dismiss stage. Well, I wouldn't, Sasha, proceed. I'm sorry, I didn't mean to cut you off, Mabel. I think the answer to that is something a little bit more than that is going on here. I mean, here you have very substantial complaints. And again, also including information directly from the police department about what was going on. So this is not a garden variety complaint. There certainly could be complaints that do not raise the obvious duty to act, such that you can draw any inferences from the failure to act. But here you have such serious harassment and so well-documented that I think that inference is fairly creative. All right. Thank you, Counselor. Judge Park. Thank you, Mr. Sandberg-Champion. The complaint includes allegations of intentional conduct as Mr. Andre's. There's intentional affliction of emotional distress. There's violation of civil rights. But there isn't such language as I see it with respect to KPM. There, it's very different. Negligence, allowing a hostile environment, failure to act. So hasn't your theory of the case changed now to try to recharacterize the allegation in paragraph 63 as the intentional discrimination, which really isn't used in the complaint as I read it as the KPM? I don't think it's changed that much, Your Honor. We've always alleged throughout this case that the failure to act under these circumstances constituted some form of intentional discrimination, whether that was deliberate indifference or whether that is a form of selective enforcement. I don't think the selective enforcement we're discussing now is very much different from a deliberate indifference. So if I can just interrupt you, I actually don't see those phrases in connection with KPM in the complaint. Selective enforcement, deliberate indifference, intentional discrimination. Am I wrong? No, you're not wrong, Your Honor. We did not use those labels in the complaint, but we certainly litigated it that way in the district court. So this is not something that has been sprung upon this court having not been litigated as well. Okay, thank you. That's all. Judge Nardini. Thank you, Chief Judge Whittington. I'm just following up on Judge Park's question. This is a question for the Plaintiffs' Counsel. Could you point me to any page in your opening brief before the panel on appeal where you argued that under the FHA, there is such a thing as an action for intentional discrimination or that you alleged it? So in our opening brief, what we alleged, what we contended was that the defendants  Where? Where in your brief? I read that in a footnote regarding your 1981 claim, but where in your brief did you allege that? And a page number. Where did you allege that with respect to your FHA claim? No, I'm sorry, Your Honor. We did not mention that with respect to the FHA claim for the simple reason that at that time, the HUD, that was not with the standard that HUD was using, but there's no obvious reason why that more stringent standard should not apply as opposed to the more lenient standard that HUD had at the time. I think it fairly is encompassed within the claim that we did make. And let me ask you another question if I could. Am I understanding correctly that you're not necessarily arguing that there was one or two specific actions that you expected the landlord to have to take, but that the problem was that they didn't undertake any action? Is that correct? That is correct, and that's very important. We're not, we're not, I'm sorry, Your Honor, go ahead. Well, no, that's good. Let me just follow up on that thought, and then I'll ask you to explain it. Would you agree that, would you have brought this in claim if Mr. Francis had come to the landlord with these complaints and they had said, this is terrible, we're gonna call the police. And every time he complained, they would call the police. Would you, in that case, argue that they had failed in their duty that you claim exists? I think that would be a much harder case for us. If we have a case in which the defendant makes a good faith effort to address the problem, I don't know that we would be here today saying that they just made the wrong choice. The key to our complaint here is that they make the deliberate decision to do nothing among the menu of options were available to them, including, by the way, affirmatively reaching out to the police to coordinate efforts, which they did not do. So I guess my question then is this. If you think it would be a hard case, and arguably one that you would lose if they had called the police, why would you hold them liable for not doing something, taking a step that they already knew had been put into action? Because the standard here is, the reason why I answered your first question that way, Your Honor, is because the standard here is pretty stringent. Their decision has to be not just unreasonable, but clearly unreasonable. So I don't think that it would have been reasonable for them to rely on the police. But if they had a good faith belief that that satisfied their duties, that might be enough. What we're alleging here is that they did not have that, they're saying that now, but that's not in our complaint. Okay, thank you very much. Thank you, Counselor. Judge Menashe. Thanks very much. So Mr. Sandberg-Champion, so you mentioned before that the inference of discrimination is drawn from the landlord's deviation from the policy laid out in the lease agreement. But I think you'd agree that not every deviation from that policy would amount to racial discrimination. So if a landlord intervenes to enforce the agreement whenever a tenant didn't pay their rent, but then never intervened in any allegations of tenant-on-tenant harassment, could we infer intentional racial discrimination by the landlord in that kind of a case? Well, you are correct that this is a much more nuanced inquiry than that. The only question we're asking right now is whether- But then what in the complaint? So in the complaint, all it says is that the defendants intervened against other tenants for violations of their leases. So are your allegations just consistent with that fact pattern? Our allegations, I think I go back to here, to our pleading standard. It's a minimal burden that we have to meet. We're not saying that we now have enough to make out a prima facie case, in summary. Yeah, but you would agree that certainly if the situation where your allegations taken as true were just as consistent with a non-racial discrimination story as they were with a racial discrimination story, then you haven't crossed the line from possibility to plausibility, and we would dismiss that complaint, wouldn't we? So I agree with that. So the key here is that what we're alleging is that these are circumstances in which it was reasonable and would have been expected of an ordinary landlord to act. I think that's what pushes it over the line because the complaint- But if you don't have any allegations, if you don't have any allegations that they ever responded to any harassment complaints, then why isn't it consistent with a story where they just never dealt with tenant-on-tenant harassment? Well, again, I go back to the pleading standard. That's not, it's not our burden here to rule out any other possibilities for why they acted like- Okay, actually, can I ask another question, which is, you said that the harassment deprived Francis of the right not to live in a hostile environment. So I guess, is that a general duty of the landlord to avoid a hostile environment, or is it because there were these guarantees in Section 8 and 12 of the lease agreements that were breached? Like, where does the duty of the landlord come from? Is it freestanding, or is it based on the agreements that they freely entered into? So I think that's just a restatement of what's required under 3604B, which is that because of race, Mr. Francis has to have been deprived of the terms, conditions, and privileges of his rental. And of course, we point to specific lease terms that were compromised by, as a result. So we make this analogy to Title VII and to Title IX. So obviously, in those contexts, employers and schools have offices like HR departments or Title IX offices that do anti-harassment training and govern the possible harassing conduct to employees. But do you think if there's this duty on the part of landlords, landlords should have such an apparatus, because they have the same duties as employers and schools? So I think what you're putting your finger on is actually the difference between the standard that HUD originally had and what we're arguing now. We're not arguing that there's a duty of the landlord that it should have known, that it has to have a monitoring apparatus or anything like that. We're saying, in fact, this landlord did know. And in fact, this landlord did already have the tools that it could have used to address the situation. We are not saying anything remotely like landlords have the affirmative duty to develop those tools where they don't already have them. Thank you, Counselor. We'll hear from the United States. Thank you. Thank you, Your Honor. May it please the Court, Alexander Malgeri for the United States. The United States is here to explain why as a textual matter, Section 3604B and 3617 of the Fair Housing Act cover post-acquisition liability and why this court should reject any atextual limitations on that liability, such as constructive eviction. Were this en banc court to do otherwise, it would mean that under the FHA, landlords and property managers could exclude black or Hispanic tenants from a residential pool. A condominium association could intentionally discriminate against Jewish property owners by prohibiting hanging a mezuzah. And it would jeopardize the sexual harassment and housing initiative launched by Attorney General Sessions and continued by the current Attorney General Barr. Textually, post-acquisition liability is covered for three simple reasons. First, the FHA has no temporal limitation. Second, by definition, a rental creates an ongoing legal relationship between a landlord and a tenant for a term, and phrases like terms, conditions, or privileges need to be interpreted using the ordinary plain language meaning, not in a narrow contractual sense. The FHA's language requiring that any discrimination be in connection with a rental or sale already creates a boundary for liability that will avoid an overly expansive scope. Things like law enforcement services, illegal dumping, or where a highway's located are not covered by the FHA's text. This court should recognize those textual limitations on the scope of liability and not substitute the constructive eviction construct for statutory terms. Second, on the separate question of if and when a landlord can be liable for the discriminatory conduct of one tenant towards another, the United States is not taking a position before the En Banc Court. Instead, we submit that for legal and prudential reasons, this court should decide that question for itself under the FHA. Yesterday, September 23rd, the Office of Information and Regulatory Affairs received from HUD a notice of proposed rulemaking to withdraw 24 CFR 100.7A1 subpart three, and that notice is received as publicly available. Subpart three, just to be clear, is a provision dealing with so-called third party liability and HUD is not proposing to rescind the provisions about direct liability or agency liability contained within that rule, nor is HUD proposing to rescind any other part of the 2016 rule, including definitions of quid pro quo harassment. Counselor, can I ask, I had a question about the sexual harassment and housing initiative. Your brief says that those cases that have been brought under that initiative typically involve demands for sex or sexual acts in order to continue occupying a property or other severe and pervasive sexual harassment. I just wondered whether any of those cases that have been brought involve situations in which the landlord was held to have violated the FHA by failing to remedy the conduct of tenants, or if the cases that have been brought under that initiative involve the landlord's own actions. Your Honor, the cases that have been brought into that initiative, which launched a few years ago, have all been against the landlord or a property owner or an agent thereof for his or her own conduct. Just to be candid, though, with the court, as our 2016 brief illustrated in one of the footnotes, historically HUD has brought a few matters at the trial level that involve the form of liability that's found in the HUD rule that's being proposed to be rescinded. And I also wanted to ask, there may be situations such as assisted living arrangements or group homes for children in which a housing provider undertakes to safeguard residents. There are provisions in the lease about safeguarding residents from the conduct of other residents. Am I understanding the United States position correctly that in such a circumstance, discrimination in the provision of services, that that would be a facilities and service discrimination if a provider was discriminating then in providing those services? Yes, that's correct, Your Honor. And I think the sort of your heartland terms, conditions, privileges, services, and facilities are going to be things that either in the fact pattern you described or situations where a landlord or a property owner provide those things. Now, we're not here to suggest that those are the only forms of terms and conditions, but yes, that's naturally where this comes up. Thank you. That's all for me. Judge Cabranas? Yes. Counsel, help me understand HUD's perspective on the state of our record. Am I right to think that nobody argued that the 2016 HUD rule controls in this case? Is that right? That is our understanding of the record, Your Honor. And I didn't take the plaintiff or the amicus to be relying on that today. If you'll recall the chronology here is that the HUD rule became effective in 2016, long post date the conduct and the filing of this complaint. The HUD final rule became effective after the initial panel had oral argument in this case. And so I do not understand the parties to be relying on that rule. And it's the government's position that it wouldn't apply in this case. In any event, as we set out in our brief, either this is an interpretive rule that would have whatever power it has to persuade, or this is a legislative rule as Judge Livingston described in her opinion at the panel stage, such that it has a clear effective date that post dates the conduct here. So what do you know, or do we know as a matter of record the extent to which the proceedings in the Second Circuit in this case informed the promulgation of the 2016 HUD rule? So let me address that to the greatest extent I can, Your Honor. So if you review the 2016 rule, you will find that there is a response by HUD in that rule, where when they promulgated the rule, HUD recognized that the district court in Francis D. King Park had come to a different conclusion than the HUD rule. So this case has been very much on the radar of the agency from the beginning, but HUD decided to go another way in 2016. I can represent to the court, and this is publicly available. I'd be happy to lodge a link to it if it's helpful to the court after argument, but HUD has made a public statement that's with OMB that subsequent developments in case law, primarily the U.S. Court of Appeals for the Second Circuit, December 2019, now vacated opinion in this case have caused HUD to reconsider its 2016 rulemaking. And I would add to that, as we've represented in our brief, the Seventh Circuit's questioning of whether the HUD rule is consistent, has adequately been explained, is also a reason why HUD has decided to consider rulemaking in a different direction. And I take it it's your position that we should not, quote, even address it, unquote. That's right, Your Honor. And I don't wanna overstate, I think, how much I think that matters. I think here, Your Honor, we don't think the rule applies. And so you should interpret the Fair Housing Act on its own terms. But if it did, of course, whether we're talking about Chevron or some other kind of deference, the first step is always determining what Congress intended here, using your traditional tool of the statutory interpretation. And so that may begin and end this case. Thank you, Counselor. Judge Pooler? Counsel, the HUD rule was issued in response to a request from this panel, the panel that decided Francis versus KPM. Isn't that correct? In part, Your Honor. So the chronology, as I understand it, is that HUD had a proposed rule when the panel had oral argument, and HUD finished that rulemaking after the panel solicited its views. But I do not believe it's accurate to say that HUD decided to finish that rule in response to the panel. Rather, the rulemaking took its course. They had a question from the panel, however, didn't they? When you say it was on the HUD radar, they had a question from this very panel, and this very panel held its decision for almost a year, waiting to hear from HUD. Isn't that correct? It is, Your Honor. Does HUD have any supervision of the Section 8 housing program? I'm not certain if I understand Your Honor's question or not. You know what I mean when I refer to Section 8? I do, Your Honor. Okay, well, Mr. Francis had Section 8 allotment applied to his rent. Doesn't HUD care about how Section 8 recipients are treated by landlords? Absolutely, Your Honor. And I think it gives me an opportunity to make clear that the allegations in this complaint are disturbing. We are here to give the government our considered views on what the Fair Housing Act means. And so in all of these circumstances, what HUD and what the government here is trying to do is help the court decide what liability standard Congress enacted. And so it would not be a question of whether our sympathies lie with the plaintiff or not, but whether Congress has proscribed the conduct in this case. Thank you, counsel. I have nothing further. Please. Thank you. Judge Katzmann. Counselor, if you could just help me understand a bit more. I've been listening to the responses, your helpful responses. I just read your brief. If your textual analysis of Section 3604B leads to the conclusion that it prohibits post-acquisition conduct of landlords ending sex from their tenants to continue occupying a property, which I think is one of the reasons the amicus to defend the Attorney General's Sexual Harassment and Housing Initiative. Doesn't that same textual analysis lead probably to the conclusion that 3604 protects acquisition conduct at issue in this case? Just asking you as a question. I wanna hear your view. Sure, Your Honor. So the government doesn't have a position on the specific issue of whether the landlord can be held liable for tenant-on-tenant harassment, but I want to be helpful here. So with that statement, we do believe these are two analytically distinct questions, and that's part of the reason we're here, as you said. The question of post-acquisition liability, you're really asking, does the FHA just leave the stage of analysis after that initial moment that a renter or an owner signs his rental documents or ownership documents? And we reject that, and we think Congress is clear that that's not the case. Now, the question of who is liable, the FHA does not contain a class of defendants, so in that respect, it's different than Title VII, which talks about employers. And so it's very important, we think, to then ask, well, what is the conduct that's prescribed? And so here, if you look at 3604B, it talks about discrimination in the terms, conditions, privileges, or services and facilities in connection with a sale or rental, quote, because of race, color, religion, sex, familial status, or national origin. So we think that the separate question of whether and when a landlord is liable requires the court to start by asking, well, has the landlord discriminated because of a protected characteristic in connection with those statutory terms? Thank you. Judge Chin. Thank you, Chief. Mr. Marjorie, so you've explained that the rule, the 2016 rule was an interpretative rule. And so this was HUD's interpretation of what the Fair Housing Act meant, correct? Yes, Your Honor. And so HUD interpreted the statute to impose liability on a person for failing to take prompt action where that person had knowledge and the power to correct. That was the interpretation in 2016, right? Correct. I saw that in 100.7A3. Yeah, and so now the rule is being withdrawn. Is it being withdrawn because HUD thinks its 2000 interpretation was wrong, or is it being withdrawn for some other reason? Well, Your Honor, what I can say is what's in the public record, or I believe will shortly be in the record, which is HUD's view, as we stated in our brief, is that its current view, and we'll keep an open mind in the rulemaking process as it's required to do under the APA, but HUD's considered view now is that it made a mistake in 2016 and that the Seventh Circuit's decision in Wetzel, where Chief Judge Wood, for the panel, talked about the salient differences between Title VII and the Fair Housing Act. This court, in the second panel, where the panel determined that it was not going to use the standard of liability and negligence, all of that influenced HUD to come to the view that this issue is better left to the courts and that it may have been mistaken in terms of its imposition of a negligence standard under the Fair Housing Act. Did the 2016 rule impose a negligence standard? Yes, Your Honor, that's how we explained it in the preamble, and that's how we explained it in 2016. Effectively, if a landlord knew and had the power to correct, the power to correct language, if you'll review the preamble to the 2016 rule, you'll see that essentially landlords are going to always have the power to correct. The way HUD interpreted it, it was effectively that landlords always had those tools. So yes, we do see that as a negligence standard, and I understand the plaintiff here to be arguing not for that negligence standard anymore. He's arguing for a deliberate indifference standard, the difference being whether you have to have actual knowledge or not. Well, the rule required actual knowledge, is my recollection. Okay, that's all I have. Your Honor, just one point on that. I believe if you look at 100.7A3, you'll see that it says knew or should have known, and the should have known language is the negligence standard. Thank you. Thank you, Counselor. Judge Loyer? Thank you, Chief. I've got a few questions. First, do you agree that the FHA imposes on a landlord the obligation to take reasonable steps to provide a non-discriminatory housing environment? I don't think I can agree with that today, in part, Your Honor, because we don't have a position on that core issue in this case. So you don't take a position either way? Correct, Your Honor. Okay. And in those cases prior to 2016, if I understood you correctly, that you mentioned that cases involving forms of harassment, how did HUD assess whether a landlord has controlled or remedy a situation involving either sexual harassment or racial harassment? Well, Your Honor, many of those predate, well, in fact, all of them that I'm aware of, you will find those matters at footnote one of our 2016 brief. I believe there are five cases there. So, Your Honor, effectively, it was a negligence standard, as I was explaining in the prior round of questioning. Although the rule does talk about the needs for control, just to be candid, the way HUD understood that, landlords mostly were seen as having control. And so where the real analytical work was done is the new or should have known standard. And you're comfortable with a known standard, you're retreating, I understand, from the should have known standard, is that correct? No, it isn't correct, Your Honor. So the government today does not have a position on the deliberate indifference known standard, doesn't have a position on the negligence standard, and it doesn't have a position on Mr. Odegboe's view that intentional discrimination is met here. We are simply saying, please do not hold that the Fair Housing Act is limited to pre-acquisition conduct, because that constructive eviction, gloss, or holding that post-acquisition conduct is not actionable, will add or eliminate, will add on elements or eliminate liability, not just for sexual harassment, but for all sorts of conduct, including the example I gave at the outset. If a landlord wanted to restrict a common area or a pool, just members of a certain race, if you were to hold that there is no post-acquisition liability, that wouldn't be actionable. And if you were to hold that constructive eviction applies, it would be difficult for us to argue that losing access to a computer room or common space or a pool is constructive eviction, but we think the FHA clearly prescribes that kind of conduct. Okay. Judge Kearney. I just want to clarify my understanding here. So the government's position, if I understand it correctly, is that the FHA governs post-acquisition interactions between landlords and renters, because that happens in the context of a lease, and it prescribes discrimination. And we've been discussing whether it's intentional or whether there are negligent acts that might be excluded, but there's no other text-based limitation on the kind of activity that might occur post-acquisition and that might be discriminatory and covered by 3604, 3617. Is that correct? Or are there categories of actions that you exclude? So I think it's partially correct, Your Honor. So I think the language in 3604B includes the terms, conditions, privileges, facilities, or services, but it also includes, importantly, in connection with a sale or rental. So if you look at opinions by other circuits, like Judge Wilkinson's opinion in the Fourth Circuit in Jersey Heights, courts have said, generally speaking, if the activities aren't causally related to housing or housing-related, that they're going to be outside the ambit. So I would say sale or rental, coupled with terms and conditions, does do work at the outer bound. So that's why things like law enforcement or where you place a highway, those are probably beyond the bound, as most circuits have found. And I offer that because I think one animating concern with the panel's opinion, as I understand it, is the floodgates idea. And so I think it's important to understand the court doesn't need to do anything other than follow Congress's language to address that concern, because the FHA tabbens liability in a textual manner. But rental is an ongoing relationship between a landlord and a tenant, correct?  that clearly, when it comes to rental, there's post-acquisition liability, but it applies to ownership situations as well. If you think about a condominium association or a homeowner's association, you're going to have terms, conditions or facilities that are offered after the moment of signing. All right, thank you very much. Judge Sullivan. I really don't have much to ask it. It seems to me, so you're really only offering a temporal argument that there's no temporal restriction on the Fair Housing Act, right? That's right, Your Honor. The only thing I would add to that is simply, I know that courts have discussed, look at Cox, other courts have discussed this idea of constructive eviction. I would commend to the panel the block en banc decision by the Seventh Circuit. I think it does a nice job explaining why constructive eviction is certainly actionable, but isn't a necessary condition for liability post-acquisition. So yes, we're here to explain why it's post-acquisition and then leads to, Your Honor, the question of whether this landlord is liable. All right, and in connection with the sale or rental is not something you're opining on either, right? Well, we would say, well, we are offering, as we sort of put forward in our amicus brief, Your Honor, what we call the interpretive shoals, I think, in the brief. We would say, yes, that language has real effects. And so we'd be happy for the court to recognize post-acquisition, but also say that, of course, they're out of bounds for liability. You don't have to spell all that out now, but you're sitting on- And you're not spelling all that now either, right? No, we're simply asserting that there is a limit and you don't need to substitute the statutory terms to achieve that. Okay, thanks. I have nothing further. Judge Bianco? I have no questions. Thank you, Chief. Judge Park? No questions. Thank you. Judge Nardini? Yeah, all my questions have been answered. Thank you. And Judge Menashe? Yeah, I have a question. When the government filed a brief before the panel, you asked the panel to give Chevron deference to the 2016 rule, right? Yep, that's right, Your Honor. And a precondition to giving Chevron deference is that Congress has given the agency the authority to promulgate an interpretation with the binding force of law, and the agency has, in fact, used that authority to issue the interpretation to which deference would be applied, right? That's right. That's correct, Your Honor. So when you were asking in your brief to the panel for the application of Chevron deference, you were saying that the rule was binding as a legal matter, right? Well, so I think, Your Honor, and this is just part of the candor to the court, in our 2018-20 brief, we explained that we are not standing by that advocation for Chevron here, and I wanna be clear on why. No, no, no, I understand. My question is not that, is that actually you've changed the position. So you were not saying that it was an interpretive rule when you filed the brief before the panel. It was a legislative binding rule, because otherwise it wouldn't make any sense to ask for Chevron deference to be applied. Your Honor, I respectfully, I think, the way I would suggest that you think about that is, HUD has always taken the position that it's interpretive. HUD said that in, the panel looked at this and thought that HUD understood it to be interpretive if you look at the panel opinion. But I- Yeah, no, I understand, but does the word interpretive appear in the notice of final rulemaking in 2016? No, it doesn't, and I guess- And in fact, HUD went through a notice and comment process to promulgate it, right? That's right, but an important point, Your Honor, is that HUD always has to go through notice and comment. And so I think there's a really interesting academic issue lurking here about the status of the rule. We don't think you need to reach it. But what I would suggest is HUD has always taken the view that it's interpretive. I think the error, which we've withdrawn, was to- No, no, but I guess that's my question. So where did HUD say that it was interpretive? Not directly, but what HUD said is that it did not believe that it was creating a new liability standard and it believed it was simply- Right, but when an agency promulgates regulations to enforce a statute, like they can exercise their authority to promulgate binding rules to spell out something that they've always believed the statute requires. In fact, it's always an interpretation of a statute whenever an agency promulgates a regulation, right? That's right, that's right, Your Honor. I guess what I would submit is whether HUD's rule is interpretive or legislative is complicated. And I don't think that it's answered by the fact that it's notice and comment. There's a large body of law where courts have struggled with exactly how you define those lines. And so- I understand that, but there is not a question when you apply Chevron deference, right? All right, well, anyway, I just have one last question about this, which is, so even for conduct that occurs after the effective date of the 2016 rule, your position is that it's not binding on anybody because it's an interpretive rule. We are, I'm not authorized to take that position today, Your Honor, because it's not presented in this case. HUD is hopeful that it won't come to that. But simply by saying that it's gonna take an interpretive rule, and as you said in your brief, that it's not binding, that is the position you're taking, right, if you said it's not binding. So you're saying it's only not binding for retroactive application, but it is binding prospectively, that would make it not an interpretive rule, right? If Your Honor accepts that it's an interpretive rule, if you look at the Meade decision by the Supreme Court, the court had said that interpretive rules as a class do not get Chevron deference. Thank you, Counselor. Thank you, Your Honor. We'll hear from Mr. Brennan. Thank you, good afternoon. May it please the court. This is Frank Brennan, and I am here to argue on behalf of the attellees, Kings Park Manor and Corinne Downing. Your Honors, the overriding question on this appeal is whether the Fair Housing Act, the Civil Rights Statutes 1981 and 1982, and New York law should be construed to impose liability on landlords for intentionally taking no action to intercede in complaints of tenant-on-tenant intentional discrimination. Based upon the law and the facts involved in this case, the answer should be a resounding no. It is the attellee's position that while replete with allegations of repugnant, anti-Semitic, and racially derogatory outbursts by Mr. Enders against the attellant and other tenants, the complaint in this action fails to raise a claim for intentional discrimination by the attellees under the law. As noted by the earlier decision of this court, the plain language of the statutes at issue do not impose an ongoing duty on landlords to prevent intentional discrimination by third parties, nor does the plain language impose liability for passively failing to address tenant-on-tenant harassment. Instead, the decision found that a claim of intentional discrimination based upon complainant's race may be inferred against the landlord that is alleged to have addressed non-race-related complaints, yet intentionally takes no action to intercede in tenant-on-tenant complaints of racial harassment, even though neither the landlord nor its agents participated in any of the underlying alleged discriminatory conduct. It cannot be inferred from the conclusory allegations at issue in this case, however, that because some other identified non-race complainants were allegedly addressed that the attellees intentionally or otherwise discriminated against this appellant based upon his race because it is just not alleged. To the contrary, the allegations at issue here actually demonstrate that the attellees responded to the complaints of other tenants regarding Ms. Endres' alleged simultaneous anti-semitic outburst in exactly the same manner as the appellant's complaints, without consideration as to race. Unlike considerations under Title VII and Title IX, the appellees here cannot be found liable for race-based intentional discrimination for an alleged intentional failure to enforce the appellant's rights under the FHA because the appellees lack both a statutory obligation and standing to do so. Likewise, the appellees are not liable under Section 1981 or 1982 because the appellant has failed to plead or otherwise allege that but for the appellant's race, the appellees would have interceded in the complaint of tenant-on-tenant racial harassment as is required by the Supreme Court's recent decision in Comcast Court versus National Association of African American-Owned Media. In light of the allegations in the complaint of similar treatment of simultaneous anti-Semitic claims made against Mr. Endres, it is impossible to infer from the appellant's pleadings that but for the appellant's race, the appellees would have taken some action to intervene to curb the anti-Semitic and racially discriminatory outbursts by Mr. Endres. With respect to the appellant's remaining claims, based on the results of the police intervention in this matter and the after-the-fact reporting of the alleged incidents to the appellees, it is impossible to find that the appellees exercised authority, ability, and opportunity to control the intentionally anti-Semitic and racially discriminatory outbursts of Mr. Endres that is necessary to support a claim under New York law. More importantly, the appellant's claims that the appellees passively failed to take any action for enforcement of the appellant's rights under any of the foregoing statutes is belied by the undisputed fact that after receiving notice of the foregoing complaint, the appellees elected not to renew Mr. Endres' lease. Thank you. Mr. Brennan, let me ask you about the warranty of habitability. As I understand it, the plaintiff's theory today, one of the theories, is that Kingsport Manor intentionally departed from its own policies and obligations, and one of the arguments is the landlords undertake this warranty. You had obligations to make the premises habitable, livable, and in light of that obligation, the fact that the landlord took no action here permits an inference of discrimination. What's wrong with that reasoning? Well, the reasoning here, Your Honor, is control. In situations where landlords are held liable for the warranty of habitability, it's over the property itself and the control that they have over the property. Here, tenants actually pay landlords so that they wouldn't have the control over their actions. Well, I guess I'm asking how far does the warranty of habitability reach? I mean, it's a statutory obligation in New York. It says that premises are to be fit for human habitation and for the uses reasonably intended by the parties. Do you interpret that to reach, to impose a duty to intervene, to mediate tenant disputes and to intervene in the context of various forms of harassing conduct of one tenant against another? No, Your Honor, and I don't think that there are any courts in New York that would hold a landlord liable for the intentional conduct of one tenant against the other. The concept here is that a landlord has to maintain the property so that it's livable. This is not a property issue. This is a tort question that has to do with intentional acts by third parties over which we have no control. So am I right in understanding that the great majority of the cases under this warranty are about the actual physical conditions of the property? I mean, I think there are some noise complaints and noise infractions might be closer to what we have here, but the bulk of the case lies about landlord's failure to maintain the premises, the physical condition of the premises. That would be correct, Your Honor. Am I right about that? That would be correct, Your Honor. Another argument that's made about landlord-tenant law is that there are provisions in this lease that address Francis's conduct. Francis agreed that he would not impair the enjoyment of residents of other tenants, and we assume Indra had a similar provision in his lease. Why doesn't that impose some measure of control in the landlord's hands to address racial harassment? Because there's little or no tools to effectively make him comply. In this case, we have an issue with the appellant going to the police first, making these complaints, having the Suffolk County Police Department make threats that they would arrest him, that he would be evicted, things of that nature. None of those work. None of those tools are available to the landlords in these situations. The sole tool that they would have is eviction, and eviction is not necessarily a tool that is going to bring this harasser into compliance. Judge Cabrera? No questions. Judge Pooler? Judge Pooler? I'm sorry, I was muted. Thank you. Counsel, could you tell me what the breakdown is on a KPM of African American tenants versus other nationalities? I do not have that number handy, your honor. You were participated in the investigation by the New York State Division of Human Rights. Isn't that correct? Your honor, I did not, but the landlord did. The landlord did, and you are representing the landlord, correct? Yes, your honor. Yes, your honor. So allegedly, you told the New York State Division that you had responded to other complaints because that was part of their findings. What were those other complaints, and what did those tenants do? Your honor, that file is not a file that I have, so I'm not aware of any complaints by an African American or otherwise that would have included a tenant on tenant complaint. Right, so you say you don't know what complaints you did respond to, and then you say Mr. Donahue has to have comparator cases. That seems like a dead end for him, doesn't it? In this case, it would not, your honor, because in this case, they've actually pled that simultaneous with the racially harassing conduct that was done by Ms. Anders, there were also complaints rendered to the landlord and to the police that anti-Semitic outbursts were taking place, and those complaints were handled in the exact same way that they're being handled here, that the police did their investigation, we learned about it after the fact, that at some point later on, after the police had completed their investigation and actually arrested Ms. Anders, that the landlord exercised this option to not renew the lease of Ms. Anders. Those are the facts that we have. Counsel, do you think that because Mr. Donahue complained to the police that KPM had no responsibilities whatsoever? Is that your argument? That would not be an argument that I would make, your honor, the argument that we have to deal with here is that the appellant elected his remedy here when he went to the police. It's completely reasonable that the landlord would let the police department complete their investigation and not interfere, and then take their action based on those findings. Counsel, there's no record that you were in touch with the police, that you tried to find out the result of their investigation or that you acted upon them finding that Mr. Anders was guilty of racial harassment, a felony. Actually, your honor, there is, and it was included in the after the fact letters that the appellant sent to the landlord. The letter that issued here literally read, I'm reporting to you this fact, that this happened, I called the police, the police officer said this. In those letters, they actually say that the police officer went to the landlord and explained to them that this is what we found, this is what's gonna happen, and we're actually going to threaten Mr. Anders that we're gonna find new accommodations for him with bars on the windows if he doesn't comply with what we, the Suffolk County Police Department, are telling him. It was in the letters. Thank you, counselor. Okay, thank you. Judge Katzmann. Thank you, yes, counselor, if you could help me understand. First, I mean, are you conceding that Mr. Anders' harassment of Mr. Francis violated the terms of Mr. Anders' lease forbidding him from interfering with Mr. Francis' enjoyment of the premises? No, not your honor. Now, could you explain? I would concede, however, that they do violate the FHA. They do violate the FHA. Now, in a circumstance in which a landlord ignores sufficiently serious instances of racial harassment, not unlike the allegations in this case, why couldn't it be susceptible to an inference of intentional discrimination regardless of whether the landlord also ignored similar harassment of people of all races? In other words, from a certain perspective, an argument could be made, I suppose, that ignoring one tenant calling an African-American neighbor a racist epithet might be bad enough so that it is all the evidence one needs, even if the landlord also ignores tenants who deploy other slurs at people of other races. Well, your honor, the issue that I have with this is that the statute itself doesn't provide for an obligation for the landlord to intervene. And then the question becomes, again, whether the landlord exercised substantial control, had knowledge, and then actually acted with indifference. It's kind of difficult to say that a landlord would have all of these things and you would have such a substantial claim here where the plaintiff or the appellant here would have the ability under the FHA to raise his own claims to prevent the conduct that's being complained of. So you would concede, though, that if a landlord intentionally sought to evict black tenants for non-payment of rent but did not seek to evict white tenants for non-payment of rent, that would be because of race. If it's a truly an active act of the landlord, yes, that would be actionable. Or if a landlord intentionally sought available remedies under a lease in response to a white tenant's complaints of racial harassment, but not to do so in response to a black tenant's complaints of racial harassment, that would be because of race as well. You could infer that it's because of race. Let's not say white, let's say an Asian-American says that, you know, I'm being discriminated against because I'm an Asian-American and we take some action. And then an African-American says, well, I'm being discriminated against because I'm an African-American and I take no action. Then you might be able to infer from that that I'm taking no action because of your race. But that's not the situation here. The plaintiff, the appellant has not alleged that anywhere in the complaint. And in fact, what he did allege here is that there were complaints made by himself and neighbors that the same discriminator made anti-Semitic comments to himself and other tenants. And it was treated exactly the same way as the appellant's complaints. And we waited for the- Thank you, Counselor. Thank you. Thank you, Counselor. Thank you. Judge Kim. Thank you. Just to follow up on some of the other questions, you would not concede that the facts alleged comes to the violation of the terms of the lease. Would you concede that there is at least a plausible allegation of a violation of the term of the lease? I don't know that I would, because again, if you're talking about an action taken by a landlord that goes back to one of the terms and privileges that is tied to the lease under 3604, then yes, if it's something where you have- The lease says that a tenant is entitled to a quiet enjoyment. And if the tenant doesn't get that, does that not plausibly allege a violation of the lease? If the quiet enjoyment is due to the conduct of the landlord, not the intentional conduct of- You're suggesting that there was nothing the landlord could do here? He could have terminated the lease. He could have brought eviction proceedings. He could have moved the other guy. Couldn't the landlord do all those things? He can't move him, but what they could have done, and what actually was done, was they elected to not renew the lease. If a, well, it took quite a while for that, but if a neighbor repeatedly made loud noise or smoked incessantly or emitted odors of some kind, are you suggesting that the landlord would have no obligation to do anything about that? No, I'm not stating that at all. I'm stating that the landlord- How would racial harassment be different then? Because you're assuming that the smoke issue, the smell issue, those issues were done intentionally to go after somebody because of race. That's not what we have here. No, no, no, no, I'm not, I'm taking race out of it, but my point is simply that if a tenant engages in those kinds of conduct, the landlord can and probably ought to do something about it. And I'm asking how this is different here. Well, what they can and ought to do is not something that they're statutorily required to do. And that's the issue here is under the FHA, there's no obligation for the landlord to take this action. All right, that's all I have. In fact, the FHA, sorry, okay. Judge Lillie? Mr. Brennan, thank you very much. I've got a few questions, and Ron takes off some questions that Judge Kasterman asked. So if a landlord responded to a request for help, for example, from one set of tenants, but refused to respond to a similar request from another set of tenants, then the only difference between those requests was that one involved sexual harassment while the other involved racial harassment. Because the landlord says, we're going to only respond to sexual harassment complaints. Would you say that the landlord's refusal to respond to the racial harassment complaints is at least probative of discriminatory intent under the FHA or under 1981? With the caveat that it's a tenant-on-tenant complaint? Yes. I would think that they would be similar. I wouldn't differentiate one because of sexual harassment and then one that's race, it could be inferred. If there was some discovery that indicated that the landlord, the KPM, or just any landlord, forget the KPM for a second, had a memo that said to the property manager, respond only to sexual harassment complaints that are made by a tenant against another tenant, do not respond to claims or complaints about racial harassment. Would that be at least probative? I'm not saying it's definitive, but would that be at least probative of discriminatory intent? It might be probative, yes. Okay. And I want to talk a little bit about control. Have we ever, in any case that you're aware of, required, any anti-discrimination case, required a plaintiff to allege the level of control of an employer or of a landlord or anything like that? Well, not when it comes to intentional. It's only when you start looking at other alternatives to intentional discrimination. Okay, okay. And I'm a little puzzled because from your brief, less so from your argument, you seem to have or take the position that some real policy problems will befall landlords if we allow this specific plaintiff to proceed beyond the complaint stage. And first of all, is it right that there's not a single landlord or association of landlords that at least in this case, has come into this case to embrace your argument? You're the only one. Sorry. No, I would agree that we are the only one, and I would also point out that the court didn't invite any to submit an amicus. Okay. Where they did submit one from the government and one on behalf of the appellant in this case. And it's- So yes, we are going this alone. Mr. Brennan, is it also right, Mr. Brennan, that the New York Court of Appeals has in a couple of decisions, but certainly in Dillman holding, recognize that landlords, when they're faced with someone, as in Dillman, who uses racial epithets, threats against other tenants and so on, it recognized that the landlord can evict, but we're not even talking about eviction here. We're talking about a range of possible responses flexibly provided to a landlord. But is that right, that the New York Court of Appeals, as a matter of New York law at least, recognizes that for forms of harassment, a landlord can proceed and has got the power to proceed to evict the harassing tenant? Well, I believe in that case, and in the cases that it cites or that it relies upon, that's a contract question, and it's a lease question, and it's really about what tool the landlord may have available to him, but not every landlord has the same tool. Thank you. Would you answer my question? I'm sorry? Would you answer my question? Which is? Which is, is it right that the New York Court of Appeals has recognized the authority or the power of landlords to evict tenants who are charged with harassing other tenants based on this? I would concede that a landlord could have the authority to do that. However, as it was held in black, just because you can evict does not mean that you have power to control over your tenants. Thank you, counselor. Thank you, Steve. Judge Carney? Thank you, Chief. I'm just following up briefly on the question of what power the landlord has. I'm looking at the Housing Assistance Payment Contract Tenant-Based Assistance Program, the tenancy addendum, which says that the owner may terminate the tenancy during the term of the lease if any member of the household commits any of the following types of criminal activity, any criminal activity that threatens the health or safety or the right to peaceful enjoyment of the premises by other residents. Would you agree that those, that description applied in this circumstance? I would not. You're reading that the HACS addendum to Mr. Francis's? Yes. That one would not be applicable to Mr. Endres, I don't believe. And the problem that we have here with trying to enforce that provision. Because Mr. Endres was not a Section 8 tenant? I don't believe that there's ever been any facts in this case that say that he was. So you don't think that there's a parallel provision? I mean, there's also a general good cause. We've talked about quiet enjoyment generally, but good cause, as described by HUD, is the disturbance of neighbors, including living or housekeeping habits that cause damage. But a criminal activity that threatens the right to peaceful enjoyment being set forth here, suggests to me that surely under New York law, that this was gonna be enforced at this place of residence, that the landlord would at least have the right to terminate and give notice of termination rather than wait passively for the end of the lease. Do you believe that there is no ability to give a notice of termination under this or a parallel clause that applied to Mr. Endres? So I would agree that under the general terms that there would be a right to evict. However, the timing of evicting somebody is longer than what it would have taken to just not renew his lease. Not to mention- Wait, wait, wait, excuse me. Yeah, but this started in February of the year and he is leased terminated and he left in January of the following year, as I recall. The police didn't get involved for some time. We were talking February, March, May, and then September. And even providing a notice of termination wasn't a measure the landlord could have taken. Isn't that correct? Well, the issue that we have here is that we invite- Could he have provided a notice of termination? We could have provided that based on the alleged criminal conduct and then faced litigation for discriminating against him based on some criminal conduct that the state doesn't want us to take action on. I mean, the guy was not convicted of anything. We have complaints, we have the police investigating, and our options here are- He pled guilty after after, right? In April of 2013? Yeah, that's way after we sent him the notice that we were going to not renew his lease and the whole nine yards. Thank you, Counselor. Okay, fine, thank you very much. Judge Sullivan? Yes, thank you, Chief. Mr. Brennan, the alternative relief requested by appellants is that if we were to affirm the District Court on the federal causes of action, that we should then send the state causes of action, the state questions to the New York State Court of Appeals. Was there any discussion of supplemental jurisdiction or anything like that below in the District Court? No, there wasn't, Your Honor. I believe that came up on appeal. If you look at Judge Spatz's decisions, Judge Spatz addressed the New York claims and essentially said that they follow the FHA claims here and that you'd have to actually find intentional conduct on behalf of the landlord. I don't believe anybody's pointed to any case from the state that said that there would be a different interpretation if it was sent back down and then certified to the Court of Appeals for New York. Well, I was a District Court judge for a long time and I used to get what I thought was conflicting signals from the circuit because sometimes they would insist that we shouldn't be exercising supplemental jurisdiction and leave that up, leave state issues up to state courts. But other times they sort of stayed quiet when District Courts just sort of dealt with the whole thing when there are similar or parallel statutes. But in the space of human rights, there's often a difference or at least an express difference between state and federal law. Why shouldn't we just leave that up to the state courts? Well, because these cases have been decided in parallel law for 50 years. I don't see any, I haven't seen any argument here for why we should, why we should depart from how this has been handled for decades. All right, thank you. I have no further questions. Thank you. Judge Bianco. Thank you, Chief Judge Livingston. I want to follow up, Mr. Brennan, on some of the questions of my colleagues with regard to, put aside the obligation to intervene. I'm just, there's no question and whether or not any type of attempt to terminate Mr. Andrews' lease or evict him, put aside whether it would ultimately be successful or would take a long time. Certainly your client had the ability to pursue that, that there was sufficient control under the lease terms and the law that it's in paragraph 30, they allege that he directly threatened to kill him. So certainly the landlord can take action when a tenant is threatening another tenant, right? To the extent that they actually did threaten that, yes. But you're talking about an allegation during a period where the- I know, but we're just talking about the ability, we're just talking about the ability, not whether it ultimately would be successful. But then the second question is this, put aside the pleadings for a moment, understanding these things aren't in the pleading, but you're also making a legal argument regarding the statute. So if they did allege that there was, this goes to the paragraph 63, which is very vague, but if they did have evidence that on tenant disputes, whether it be noise or otherwise, that your client would intervene and take action to prevent that, and that it was solely in this category where your client took no action, and maybe let's just add to Judge Loya's hypothetical, I think he gave you a memo, but I'm gonna, suppose they had comments from, that suggested that there was racial animus towards African-American tenants. They had direct animus that Kings Park didn't want the African-American tenants there. Suppose those were the allegations, your position would still be that the Fair Housing Act would not provide any type of action towards the landlord on those facts. On those facts, I still don't see where there's an obligation of the landlord to take action, or let me back up. I still don't see where you can say that it's discriminatory by the landlord to not take an action to protect a tenant from intentional tenant on tenant threats based on race. Even if the purpose of the landlord in not taking action is to try to get the African-American tenants to leave, you're still saying that the Fair Housing Act doesn't come into play there. Yeah, well, if you can show that there's an intent that the landlord wanted to get the African-American to leave, or if there's even an allegation that they did it because the landlord was taking this action to deprive the tenant of the right to live there under 3604B, then yes, it would be actionable. And it would be actionable directly by the tenant against the landlord under 3613. Thank you, counselor. Thank you. Judge Park. Yeah, thank you. I just wanted to follow up on a question from Judge Sullivan about New York State causes of action. And in particular, the argument that the 2019 amendment changes the way that it should be interpreted to no longer be necessarily parallel with the federal counterpart. Did you want to address that? The amendment still has not changed the way that it was enforced before. In amending the statute, they could have found that failure to take an action like this is actionable against the landlord, where there's no actual act required here, but they didn't. I don't see how the amendment changes the analysis pre-2019, at least in this case. Okay, thank you. Judge Nardini. Thank you. If I could direct your attention to paragraph 63 of the complaint. This is the one where there's the allegation that in the human rights investigators file, according to that file, the landlord had intervened against other tenants regarding non-race related violations of their leases or the law. And I think this may be going back to Judge Pooler's question. I just want to make sure that I understand the state of the record. And so just tell me, is it correct that there is nothing in the record that was appended to the complaint that goes beyond the allegations in paragraph 63? In other words, we don't know from the complaint what these other interventions related to, is that correct? That's correct. Okay. And if I could then ask a different question, which is about the plaintiff, as I understood it, had originally argued that the FHA created liability under a negligence standard. The focus today has been on intentional discrimination in various forms, whether selective enforcement or deliberate indifference or some other form. Could you tell us what's your view has, has that been a complete change of position or is it really just been a shift in emphasis? What's your view on that? If you look at the pleadings in this case, Judge Spak's decisions, and then all of the briefs here, I think that the position has evolved to follow the various avenues or paths to try to find some intentional or alternative to an intentional claim against the landlords for discrimination based on not what the landlord did, but because the harassing tenant had done it in a racial context. That's the way we see the evolution of the claims here. Okay, thank you very much. Thank you. Judge Menasche. Thanks very much. I had said earlier, and I think you might have given conflicting answers on this point, so I wanna be clear, but you had earlier said that you didn't concede that Indris was in violation of the lease. And I just wanna focus on this lease provision we have at page 53 of the appendix, which says, tenant shall not allow or commit any objectionable or disorderly conduct, noise, or nuisances in dwelling unit by the tenant, his or her guests, or invitees that disturbs or interferes with the rights, comforts, or conveniences of other residents. Is your argument because Indris didn't act in the dwelling unit, in his dwelling unit, but was outside that it doesn't violate the lease, or is there some other reason, or you think his conduct would have violated the lease agreement? In all, I think that once we have let the Suffolk County Police Department complete their investigation, we found the acts as alleged by Mr. Indris to be violative of his agreement, which is why, at the end of the day, November 14th, whatever it was, we didn't remove it. Sorry, sorry, sorry, is it this provision that I've just read about the objectionable or disorderly conduct, is that the provision that he violated? I think that, as far as this landlord goes, I think that it's the essence of his lease in addition to this specific term. Okay, but you think that you couldn't take action until the police had finished their investigation, or the police investigation was the way you were going to evaluate the, why couldn't you take action until the end of the police investigation? There's a couple of issues here. We have, this is a he said, he said, let's just say, that one tenant says the other tenant does something. The appellant here is saying we should have some obligation to investigate, to look into this. We don't have the means to investigate the same as the Suffolk County Police Department does. They're doing their investigation. They're coming to terms with these things. And in the interim, we're not going to get involved. And interrupt a police investigation. Now you have to remember something. If you look at the facts here, we don't find out about this. I get it. I can ask a different question, which is, so for objectionable disorderly conduct that falls short of criminal activity, how do you normally enforce that provision of the lease agreement? When the police were not involved. If the police were not involved? In, normally they say, if it's disorderly conduct, it's not necessarily criminal, right? So, so what would you normally do if somebody says, one of my neighbors is engaging in disorderly conduct that is interfering with my rights as a resident? Typically they would handle it the same way you would handle any other complaint. The garbage wasn't taken out. There's a light bulb out. The complaint gets made to the property manager. The property manager may look into it. And then, and if there's some action to be taken, then we would take it in that situation. And what would it be? I mean, so if it's tenant on tenant disorderly conduct, what would you do? There's not a whole lot we can do. We can evict. Thank you, Counselor. We'll hear from Mr. Sandberg-Champion. Thank you, Chief Judge Livingston. Let me pick up right where my adversary left off. I think he acknowledged exactly the core of our case. If this were a different type of complaint, then the complaint gets made to the property manager and the property manager looks into it in his court. Here, on the other hand, KPM specifically instructed the property manager, don't look into it. That's the core of our claim of differential treatment with respect to a complaint of racial harassment. With respect to the control that the landlord could exercise here, I'd like to commend to this court the discussion of control in Wetzel, which is really the case that is most directly on point to this one. And Wetzel, the Seventh Circuit said, control in the absolute sense is not required for liability. Liability attaches because a party has an arsenal of incentives and sanctions that can be applied to affect conduct, but fails to use them. That's exactly what we're saying that the landlord had here. As Wetzel notes, it might've been enough just to a mere reminder that eviction was a possibility might have deterred some of the bad behavior. Again, the same thing here, just a warning to raiment interest might have deterred some of the behavior that was instead allowed to continue. With respect to, there's been some discussion of public housing authorities and what this decision would mean for them. I commend to this court's attention the City of New York's brief, much of which is focused on that point. What the City of New York says is that although public housing authorities had some serious concerns about the standard articulated in the HUD rule, the standard that we're describing today really doesn't address, really doesn't cause any of those problems. And it's quite reasonable for public housing authorities like other landlords to deal with. And that's because this is a standard that kicks in only in the most extreme and discriminatory circumstances. I don't think it would cause a floodgates problem. If anything, the far more disturbing result would be to say that a complaint like this does not allege discrimination that's remediable under the Fair Housing Act. Thank you, Your Honor. Thank you all. Very nicely argued by all in very unusual circumstances. That concludes the argument. So I'll ask the deputy to adjourn.